14 F.3d 602
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Audrey ANDERS, Defendant-Appellant.
 No. 93-5121.
 United States Court of Appeals, Sixth Circuit.
 Dec. 21, 1993.
 
 Before: KENNEDY, MILBURN, and GUY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Audrey Anders was charged in a multiple count indictment (Indictment CR 91-20304-M1) with fifteen counts of bank fraud, violations of 18 U.S.C. Sec. 1344, and with one count of misapplying bank funds, a violation of 18 U.S.C. Sec. 656. Defendant appeals her convictions of three counts of bank fraud and one count of misapplying bank funds. Defendant raises several issues on appeal. The first two involve an earlier indictment (Indictment CR 90-20278-G), which was dismissed without prejudice for violation of the Speedy Trial Act. Defendant asserts that (1) the District Court erred in dismissing this indictment without prejudice in absence of an evidentiary hearing on whether it should be dismissed with or without prejudice and (2) that the District Court abused its discretion when it dismissed the indictment without prejudice. Defendant next asserts that the District Court erred in denying her motion to dismiss the indictment in the instant case (CR 91-20304-M1) for violations of the Speedy Trial Act. The fourth issue is whether the present indictment is multiplicitous. Lastly, defendant asserts that the District Court erred by ordering restitution in the amount of $36,000. For the reasons stated below, we affirm.
 
 I.
 
 2
 This case involves defendant's activities at the East Poplar Branch of the First Tennessee Bank when she worked there as a payroll teller and draft clerk. Defendant and a co-worker, Jean R. Kay, were allegedly co-conspirators in a scheme to embezzle funds from the bank. Defendant was charged in two separate indictments for these activities. The first was dismissed without prejudice when trial was not commenced within the time permitted by the Speedy Trial Act. Jury trial on the second of these two indictments (Indictment CR 91-20304-M1) began on August 3, 1992. On August 7, 1992, defendant was found guilty of three counts of bank fraud and one count of misapplying bank funds (Counts XIII-XVI). The jury could not reach verdicts on the remaining twelve counts and a mistrial was declared on those counts. On December 21, 1992, defendant was sentenced on all four counts of conviction to twenty-four months of concurrent imprisonment followed by three years of supervised release. The court ordered defendant to make restitution to the First Tennessee Bank in the amount of $36,000. The court further ordered that defendant pay a $200 special assessment fee, which represented $50 for each of the counts of conviction. A more complete description of the relevant facts will be presented with each issue.
 
 II. Speedy Trial Act
 A. Indictment CR 90-20278-G
 
 3
 An indictment returned by the grand jury in the Western District of Tennessee on November 15, 1990 ("Indictment CR 90-20278-G" or "the original indictment") named defendant in twenty-nine of its thirty-four counts alleging violations of the bank fraud statute, 18 U.S.C. Sec. 1344. Defendant made her initial appearance on November 19, 1990. Jean R. Kay was charged in the same indictment. Each count alleged a scheme by defendant and Kay to embezzle money from the First Tennessee National Bank. The initial trial date was set for January 7, 1991, and was later reset for February 11, 1991. During 1991, the District Court issued numerous continuances of the trial date through July 22, 1991, all upon motion of defendant and/or co-defendant Kay. Kay died on April 4, 1991. Due to a dispute over the post-mortem admissibility of Kay's grand jury testimony, the court postponed the trial date until July 29, 1991 upon its own motion.
 
 
 4
 On July 29, 1991, the government announced to the court that, in the event it could not reach a plea agreement with defendant, it would not proceed to trial on the original indictment. On August 19, 1991, after plea negotiations proved fruitless, a superseding indictment against defendant issued charging her with the same conduct that was charged in the original indictment. Defendant was arraigned on the superseding indictment on August 28, 1991. The matter was set for trial on September 18, 1991.
 
 
 5
 On September 16, 1991, defendant filed a motion to dismiss the indictment with prejudice for violation of the Speedy Trial Act (the "STA" or the "Act"). The next day, the United States filed its response; it conceded that the speedy trial clock had run, but requested that the indictment be dismissed without prejudice. The court held a telephone conference on September 17, 1991 on defendant's motion. The court stated that all but one of the sixteen counts would have to be dismissed for speedy trial violations and that it believed that the dismissal should be without prejudice. The following colloquy took place during the telephone conference regarding the issue of whether the indictment should be dismissed with or without prejudice:
 
 
 6
 MR. DUKE [Defense counsel]: Judge, is the court not open to the issue of whether it should be dismissed with or without prejudice?
 
 
 7
 THE COURT: Well, I have thought about it. If you want to file something else, I will consider it. I thought I heard you suggest perhaps it should be with prejudice and [AUSA] Donelson Monday saying it should be without prejudice. I thought about it, and I have made the initial decision it should be without prejudice, but if you want to make any further argument directed to the with prejudice argument, I will certainly hear it.
 
 
 8
 MR. DUKE: That would just take more of the Court's time, I guess, if you have decided what you are going to do.
 
 
 9
 THE COURT: I didn't disregard your argument in your first memorandum. Do you have anything new to say about it?
 
 
 10
 MR. DUKE: Nothing new. Just look at the statute and the test as to whether it should be dismissed with or without prejudice. As long as they are dismissed without prejudice, the Speedy Trial Act has no significance.
 
 
 11
 MS. DONELSON [Government Counsel]: That's not what the case law says.
 
 
 12
 THE COURT: From the defendant's point of view I can understand why you would like to have the indictment dismissed with prejudice, but there has to be some prejudice--the applicable test has to be met.
 
 
 13
 MR. DUKE: Yes. Okay.
 
 
 14
 THE COURT: We get into these speedy trial situations, and this is not the only factor to be considered, but one of the factors to be considered is certainly the fact that the government really has nothing to do with the speedy trial problem here. In this case I suppose you can argue somehow it came about through the superseding indictment and what not, but, you know, the government is not the party that decides when to set these cases for trial. The clerk is. Certainly, the fact is not determinative, but it is one of the things that you think about in going through cases.
 
 
 15
 Okay, well, I will enter an order going to the various factors that need to be considered on that issue.
 
 
 16
 MS. DONELSON: Okay.
 
 
 17
 MR. DUKE: Okay, Judge.
 
 
 18
 Joint App. at 103-05.
 
 
 19
 Defendant did not request an evidentiary hearing in her motion to dismiss with prejudice; she merely stated that "the reasons for the delay warrant that the dismissal be with prejudice." Similarly, at no time during the telephone conference did defendant request such a hearing, nor did she point to any evidence or make any argument different from that included in her motion. On September 18, 1991, the court entered its order dismissing the indictment without prejudice.
 
 
 20
 Under the provisions of the Speedy Trial Act, a trial is required to commence within seventy non-excludable days of a defendant's indictment or initial appearance, whichever is later. 18 U.S.C. Sec. 3161(c)(1). Days are excluded pursuant to 18 U.S.C. Sec. 3161(h). There is no dispute that a violation of the Act occurred. There is likewise no dispute that the District Court was required to dismiss the indictment under 18 U.S.C. Sec. 3162(a)(2).[1] The dispute centers around defendant's claim that the District Court erred when it dismissed the indictment without prejudice without first holding an evidentiary hearing on whether the indictment should be dismissed with or without prejudice. Defendant also claims that the District Court abused its discretion in dismissing the indictment without prejudice.
 
 1.
 
 21
 In support of her first claim, defendant relies upon United States v. Delgado-Miranda, 951 F.2d 1063 (9th Cir.1991), for the proposition that she was entitled to an evidentiary hearing on the issue of dismissal with or without prejudice. In Delgado-Miranda, the Ninth Circuit held that "before a district court can enter a dismissal without prejudice [for a STA violation], it must hold a hearing at which the defendant is entitled to counsel. The defendant must be given adequate notice of this hearing and be afforded an opportunity to be heard." Id. at 1064.
 
 
 22
 Delgado-Miranda is distinguishable from the present case for several reasons. In an earlier opinion, the Ninth Circuit held that there had been a STA violation, reversed the conviction and remanded the case to the district court with directions to determine whether the dismissal should be with or without prejudice. United States v. Delgado-Miranda, 917 F.2d 566 (Table) 1990 WL164655, * 1, 1990 U.S.App., LEXIS 18892, * 1 (9th Cir. Oct. 26, 1990).
 
 
 23
 A conclusion upon remand that the dismissal be with prejudice would result in the judgment and sentence being set aside; dismissal without prejudice would result in reinstatement of the judgment and sentence. Id. at * 4 (quoting United States v. Antonio, 705 F.2d 1483, 1487 (9th Cir.1983).
 
 
 24
 On remand, the government moved to reinstate the judgment and sentence; essentially arguing that the dismissal should be without prejudice. The district court granted the motion without stating its reasons for doing so or holding any hearing whatsoever.
 
 
 25
 In marked contrast, defendant in the present action had both notice and the opportunity to be heard on this issue. In its order dismissing the indictment without prejudice, the court discussed the factors that the Act instructs courts to consider when deciding whether a dismissal should be with or without prejudice. See 18 U.S.C. Sec. 3162(a)(2). The procedural posture of this case is also different as the dismissal issue arose when defendant filed a motion to dismiss with prejudice. The motion could have included, but did not include, arguments for dismissing with prejudice. The government's response included a memorandum that argued for dismissal without prejudice. During the telephone conference on this issue, defense counsel had the opportunity to respond to the government's arguments with new or additional evidence, but declined to do so. When the issue was discussed in an informal telephone conference, which itself is a hearing, defendant had the opportunity to present the court with any evidence she wished on the matter. Further, defendant has not pointed to any authority in this Circuit requiring that an evidentiary hearing precede a dismissal under section 3162(a)(2). Under the circumstances of this case, we conclude that the court did not err in deciding whether to dismiss the original indictment with or without prejudice without first conducting a formal evidentiary hearing on the issue.
 
 2.
 
 26
 When a court is presented with the question of whether to dismiss an indictment due to a violation of the Act with or without prejudice, it must consider the following:
 
 
 27
 the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.
 
 
 28
 18 U.S.C. Sec. 3162(a)(2).
 
 
 29
 This Court has applied a "modified abuse of discretion standard" of review when reviewing a dismissal under section 3162(a)(2). United States v. Kottmyer, 961 F.2d 569, 572 (6th Cir.1992). "Since 'Congress has declared that a decision will be governed by consideration of particular factors,' we must ensure that the district court 'carefully consider[ed] those factors as applied to the particular case and ... clearly articulate[d] their effect.' " Id. (quoting United States v. Taylor, 487 U.S. 326, 336 (1988)). "Only then can an appellate court ascertain whether a district court has ignored or slighted a factor that Congress has deemed pertinent to the choice of remedy, thereby failing to act within the limits prescribed by Congress." Taylor, 487 U.S. at 337. "If the district court properly considered the statutory factors, its 'judgment of how opposing considerations balance should not lightly be disturbed.' " Kottmyer, 961 F.2d at 572 (quoting Taylor, 487 U.S. at 337).
 
 
 30
 In the present case, the District Court considered and discussed the factors enumerated in section 3162(a)(2). The court first noted that the offenses alleged are serious ones, which spanned a four-month period, involving a $283,000 loss to the bank and alleged violations of a position of trust. Defendant does not challenge this finding.
 
 
 31
 As to the second factor, the court set forth the following synopsis of the facts and circumstances leading to dismissal:
 
 
 32
 [T]he government was not responsible for the vast majority of the delay in this case. Defendants requested a number of continuances. In addition[,] the clerk's office failed to monitor the case and set it promptly for trial after the return of the superseding indictment. The government's action in electing to present a superseding indictment was not unreasonable. Anders' co-defendant had died. Kay had testified before the grand jury, and with her death there was a question of the admissibility of her grand jury testimony. After plea negotiations did not result in the resolution of the case, the government elected to modify its allegations. The facts and circumstances leading to dismissal do not warrant that the dismissal be with prejudice.
 
 
 33
 Joint App. at 46-47.
 
 
 34
 Defendant asserts that it was error for the court to rely on the clerk's failure to properly monitor the case as a factor militating in favor of dismissal without prejudice because the STA was intended to decrease delays due to administrative oversight. Defendant cites several cases that stress the joint responsibility of the courts and the government to monitor the time limitations of the Act. See United States v. Ramirez, 973 F.2d 36, 38 (1st Cir.1992); United States v. Jordan, 915 F.2d 563, 566 (9th Cir.1990); United States v. Perez-Reveles, 715 F.2d 1348, 1353 (9th Cir.1983).
 
 
 35
 In Ramirez, the STA violation was due solely to the failure of the court to timely rule on pre-trial motions filed by the defendants. The court believed that "[e]ven though the oversight was accomplished without malice, that does not ameliorate the gravity of its effects. When a STA violation is caused by the court or the prosecutor, it weighs in favor of granting a dismissal with prejudice." Ramirez, 973 F.2d at 39 (quoting United States v. Hastings, 847 F.2d 920, 925 (1st Cir.1988), cert. denied, 488 U.S. 925 (1990)). Defendant fails to note that in Ramirez, the issue was whether the district court had abused its discretion by dismissing the indictment with prejudice.
 
 
 36
 In Kottmyer, this Court upheld a dismissal without prejudice where the district court articulated its findings on each of the three statutory factors. The district court in Kottmyer placed most of the blame for the delay on itself and the government. It also placed blame with the defendants for their failure to bring the delay to the court's attention. Even though this second factor weighed in favor of dismissal with prejudice, this Court was satisfied that the District Court had not abused its discretion because the record "establishe[d] that the court considered the reasons for the delay and articulated its findings" and was devoid of any evidence of "intentional dilatory conduct" or "a pattern of neglect by the government." Kottmyer, 961 F.2d at 573.
 
 
 37
 In the present case, thirty-eight days of non-excludable time elapsed from the day defendant was arraigned, November 19, 1990, until the first amended trial date of February 11, 1991. The next block of non-excludable time, twenty-one days, occurred after plea negotiations failed. This delay can be attributed to the government because of its decision to supersede the original indictment; the court found that this decision was not unreasonable. On August 19, 1991, the day the superseding indictment issued, fifty-nine days of the speedy trial clock had elapsed. The court attributed the final block of nonexcludable time, thirty days, from the time the superseding indictment was returned until the matter was set for trial on September 18, 1991, to the court clerk. If the trial had commenced on September 18, the Act would have been violated because eighty-nine days would have elapsed between the day defendant was arraigned and the day trial was set for commencement. The speedy trial clock in fact ran on August 31, 1991.
 
 
 38
 In its discussion of the third statutory factor, the court found that the delay was not inordinate, nor was the government's action calculated to cause delay. On the basis of those findings, the court concluded that a dismissal with prejudice was "not necessary to deter action that frustrates the purposes of the Speedy Trial Act." As a final consideration, the court noted that defendant did not claim to have been prejudiced by the delay.
 
 
 39
 In Kottmyer, this Court stated that "[t]his [third] factor requires the district court to consider whether the delay has prejudiced the defendants and whether dismissal with prejudice is warranted to ensure further compliance with the Act." Id. 961 F.2d at 573. Defendant appears to argue that a dismissal without prejudice under any situation would frustrate the mandate of the Act and that only when a dismissal is with prejudice will justice be served. The Supreme Court rejected this argument in Taylor:
 
 
 40
 It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays. Nonetheless, the Act does not require dismissal with prejudice for every violation. Dismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds.... If the greater deterrent effect of barring reprosecution could alone support a decision to dismiss with prejudice, the consideration of the other factors identified in Sec. 3162(a)(2) would be superfluous, and all violations would warrant barring reprosecution.
 
 
 41
 Taylor, 487 U.S. at 342 (citation and footnote omitted).
 
 
 42
 In sum, most of the non-excludable time in this case is attributable to the court and the government; this weighs in favor of a dismissal with prejudice. However, under an abuse of discretion standard of review, our primary concern is to ensure that the court considered the reasons for the delay and articulated its findings on the record, see Kottmyer, 961 F.2d at 573, as the court did here. Further, the other two factors support the court's decision to dismiss without prejudice. The alleged offenses are serious and there is no evidence of intentional delay or a pattern of neglect on the part of the government. Finally, the court found that defendant had not alleged that she had been prejudiced by the delay. We hold that the court did not abuse its discretion in dismissing Indictment CR 90-20278-G without prejudice.
 
 B. Indictment CR 91-20304-M1
 
 43
 On October 16, 1991, defendant was charged by the grand jury in the Western District of Tennessee in Indictment CR 91-20304-M1, alleging bank fraud violations, in violation of 18 U.S.C. Secs. 1344 and 2, and the misapplication of funds, in violation of 18 U.S.C. Sec. 656, for the same conduct involved in the original indictment. Defendant made her initial appearance on October 18, 1991. She was arraigned on October 24, 1991. The District Court set the trial date for December 16, 1991.
 
 
 44
 On November 7, 1991, defendant filed a motion for a continuance; the motion requested a new trial date after January 15, 1992 on the grounds defense counsel had prior commitments scheduled on December 16th and in early January. On November 12, 1991, the court granted defendant's motion and ordered the trial date to be continued generally to be reset by the court. The court found that the time period from November 7, 1991 until the new trial was excludable delay under 18 U.S.C. Sec. 3161(h)(8)(B)(iv) "because the interests of justice in allowing defendant continuity of counsel outweigh the need for a speedy trial." Joint App. at 69.
 
 
 45
 On December 18, 1991, the court reset the trial date for February 10, 1992, with a January 31st report date. On January 15th, defendant filed a motion in limine; the court dismissed the motion as moot on January 29th. On the January 31st report date, the Assistant United States Attorney ("AUSA") advised the court that she was in trial and believed that she would still be in trial on the day defendant's case was set for trial. The court did not reset the trial date at that time, but advised the parties to discuss the matter and report back to the court on February 6th with an update. On February 6th, the AUSA advised the court that she was still in trial and would be in trial on February 10th. On February 12th, the court continued the February 10 trial date generally to be reset by the court. The court excluded the time period from February 10, 1992 to the new trial date under 18 U.S.C. Sec. 3161(h)(8)(B)(iv) "because the interests of justice in allowing the government continuity of counsel outweigh the need for a speedy trial." Joint App. at 70.
 
 
 46
 On February 28th, defendant filed a motion to dismiss Indictment CR-91-20304-M1 with prejudice for violation of the STA based upon the argument that Indictment CR-90-20278-G was erroneously dismissed because the court had failed to conduct an evidentiary hearing on whether the dismissal should be with or without prejudice. The motion included a request for a hearing. In its response, filed March 10, 1992, the government asserted that defendant had waived any further hearing on the prejudice issue when her counsel stated that defendant had nothing new to present to the court on this issue in the September 17, 1991 telephone conference.[2] On May 13, 1992, the government filed a supplemental response to the motion and attached a transcript of the telephone conference.
 
 
 47
 On July 9, 1992, the court contacted counsel and advised that the court wanted to hear argument and any proof from defendant on the pending motion to dismiss. Joint App. at 138. On July 13, 1992, defense counsel informed the court that he had nothing new to offer, but was planning to order and submit all transcripts to the court. Joint App. at 137. Based upon this representation, the court delayed any hearing on the motion. The court convened a hearing on July 30th at which defense counsel informed the court that defendant had no additional information to submit in connection with the pending motion. On July 31st, the court entered its order denying the February 28, 1992 motion to dismiss. In this order, the court noted that defense counsel had been afforded two opportunities to submit further evidence on the with or without prejudice issue after the original indictment had been dismissed, and had declined to do so. Joint App. at 108-09.
 
 
 48
 On July 31st, defendant filed a second motion to dismiss Indictment CR-91-20304-M1, this time challenging the time deemed excludable under the Act. The government responded on the same day asserting that the time had been properly excluded. On August 8, 1992, the court denied this second motion after it found that, according to its calculations, the non-excludable delay totaled less the seventy days.
 
 
 49
 The speedy trial clock began to run on October 19, 1991, the day after defendant made her initial appearance. Henderson v. United States, 476 U.S. 321, 326 (1986) (speedy trial clock begins on the latest of a defendant's indictment, information or appearance). The clock was tolled the day of defendant's arraignment, October 24, 1991. United States v. Mentz, 840 F.2d 315, 326 (6th Cir.1988). The initial trial date was set for December 16, 1991. On November 7th, defendant filed a motion for a continuance of the December 16th trial date to a "date after January 15, 1992." The clock was tolled from November 7th until November 12th when the court granted the motion. 18 U.S.C. Sec. 3161(h)(1)(F). The total of non-excludable days from October 19th through December 15th is 51. The court excluded the time from December 16, 1991[3] until the new trial date, which was set for February 10, 1992, under the "ends of justice" exclusion, 18 U.S.C. Sec. 3161(h)(8)(B)(iv). Defendant challenges this exclusion to the extent that it excludes time beyond January 15, 1992.
 
 1.
 
 50
 Defendant agrees that a continuance up until January 15, 1992 was in the interests of justice, but argues that the basis of the continuance ceased to exist when defense counsel was available for trial on January 16th. Under section 3161(h)(8)(A), if a court grants a continuance on the basis of its findings that "the ends of justice [are] served by taking such action [and] outweigh the best interest of the public and the defendant in a speedy trial," the court cannot exclude the resulting period of delay unless "the court sets forth, in the record of the case, either orally or in writing, its reasons for" its findings. Section 3161(h)(8)(B) provides certain factors a judge shall consider in determining whether to grant a continuance under subparagraph (A), including "[w]hether the failure to grant such a continuance ... would unreasonably deny the defendant or the Government continuity of counsel...." 18 U.S.C. Sec. 3161(h)(8)(B)(iv). Defendant asserts that the time after January 15th is not excludable because the court failed to make any findings on whether a continuance for continuity of defense counsel would be justified beyond January 15th. In an identical argument, defendant challenges the court's exclusion of time based upon a continuance granted for continuity of government counsel. Defendant argues that the court failed to make findings that this continuance was necessary after February 10th.
 
 
 51
 In United States v. Crawford, 982 F.2d 199 (6th Cir.1993), this Court held that an "ends of justice" continuance was not excludable because of the district court's failure to make findings on whether the continuance served the ends of justice. The facts of Crawford are extreme: the district court did not indicate that the continuance would serve the ends of justice before it granted the continuance; the court did not state its reasons or findings when it granted the continuance; the court did not specify or approximate the length of the continuance; and the court did not even explicitly grant a continuance.
 
 
 52
 In this case, the court explicitly found that both continuances would serve the ends of justice because the interest in allowing defendant and the government continuity of counsel outweighed the need for a speedy trial. In her motion, defendant requested that the trial date be continued until after January 15, 1992, which it was. A party who moves for a continuance until after a particular date cannot demand that that trial commence on a day she unilaterally chooses. A trial court is entitled to a reasonable number of additional days to accommodate its schedule under an ends of justice exclusion. The court granted the second ends of justice continuance upon advice by the AUSA, who was in trial in an unrelated case on February 6, 1992, that the trial was scheduled to continue into the week of February 10, 1992. We hold that the District Court properly granted both continuances.
 
 2.
 
 53
 Defendant next challenges the court's exclusion of the time from the filing of her motion to dismiss the indictment on February 28, 1992 until the final disposition of the motion on July 30, 1992. The government asserts that the time was properly excluded under 18 U.S.C. Sec. 3161(h)(1)(F) as "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of the matter." Subsection (J) of the same section provides that time may be excluded for "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement under the court."
 
 In Mentz, this Court observed that
 
 54
 [t]he language of these exclusions, as interpreted by the Supreme Court in Henderson v. United States, 476 U.S. 321 (1986), distinguishes between motions that require a hearing and those that do not. If a motion requires a hearing, we look first to section 3161(h)(1)(F), which excludes all the time between the filing of the motion and the conclusion of the hearing on that motion. This exclusion of the time prior to the conclusion of the hearing is automatic. After the hearing, the district court may need additional time to receive supplemental filings from the parties for proper resolution of the motion. This time is also excluded. Once the hearing is concluded, and the district court has received all the submissions, there must be "prompt disposition" of the motion. This is where section 3161(h)(1)(J) comes into play. That provision excludes a maximum of 30 days from the day the motion is "actually under advisement" by the court.
 
 
 55
 Mentz, 840 F.2d at 326 (citations and footnote omitted).
 
 
 56
 Defendant attempts to argue that her motion did not require a hearing. Therefore, she argues, subsection (J)'s "under advisement" period began to run on March 11, 1992, the day after the government filed its response to defendant's motion to dismiss, from which time a maximum of thirty days could be excluded. This argument is without merit because, as the government notes, defendant's motion itself requests a hearing.
 
 
 57
 Furthermore, even if this motion were viewed as one that did not require a hearing, the time during which a court must wait for additional submissions from the parties is automatically excluded. Mentz, 840 F.2d at 327. A motion is not considered "under advisement" until "the court receives all the papers it reasonably expects...." Id. (quoting Henderson, 476 U.S. at 329). In this case, defendant represented to the court that additional submittals were forthcoming. It was not until July 30, 1992, that defense counsel advised the court that defendant would make no further submittals. As the district court noted in its order denying defendant's motion to dismiss: "It would be ironic and, indeed, unjust if a defendant, by her own actions and requests for review, additional submittals and a hearing, is able to create a basis for dismissal." Joint App. at 136.
 
 
 58
 As there were fewer than seventy days of non-excludable delay from the time of defendant's initial appearance until the day the cause was brought to trial, we find no violation of the Speedy Trial Act.
 
 III. Bank Fraud Statute
 A.
 
 59
 The pertinent facts of defendant's embezzlement scheme are as follows: During a four-month period of 1989, defendant engaged in a scheme to defraud her employer, First Tennessee Bank ("FTB"), while employed as a payroll teller and draft clerk. As a payroll teller,[4] defendant was responsible for ordering money for the East Poplar Branch of FTB from Central Tellers. Defendant received cash shipments from Central Tellers and signed for the shipments. Debits were entered by Central Tellers on bank documents called "currency in transits," which showed the cash was being moved from Central Tellers' funds to the branch. Receiving tellers would enter a currency-in-transit credit upon receipt of the money, which would balance the debit entry. At East Poplar, payroll tellers like defendant were required to verify the currency and enter the credit within twenty-four hours of receipt of the cash shipments.
 
 
 60
 Defendant had an alleged pattern of late entries of currency-in-transit credits from July 17, 1989 through November 14, 1989, which tipped off bank officials that money was missing. On November 7, 1989, defendant had received two shipments of cash; one for $45,000 and the other for $100,000. As of November 16th, however, the credits for these shipments had not cleared. When questioned about these missing entries, defendant claimed that she had given the money to Jean R. Kay to use in the Automatic Teller Machine ("ATM"). It was later discovered that the denomination of the bills in the $45,000 shipment could not have been used in ATMs. Defendant also told bank officials that she knew something about money Kay had taken and that she had held a personal check of Kay's in the amount of $140,000 to $150,000 in exchange for cash. Defendant told bank investigators she had also carried a $44,000 shortage for Kay by giving her $44,000 in cash in exchange for another personal check. None of Kay's personal checks were complete, i.e., they were undated and had no payee's name. Kay's last day at the bank was November 9, 1989; defendant's last day was November 16th.
 
 
 61
 Further investigation revealed that defendant had received another $100,000 cash shipment on November 14, 1989 and did not file a currency-in-transit credit. Defendant also misapplied a $38,000 check from a draft customer, Mid-South Motors, to clear a currency-in-transit debit for a $45,000 cash shipment received by defendant on October 30, 1989. Defendant entered the credit to clear the $45,000 debit on November 9, 1989. It was also discovered that defendant had written checks similar to those written by Kay and given them to Kay apparently in exchange for cash.
 
 B.
 
 62
 The Bank Fraud Act provides in pertinent part:
 
 
 63
 Whoever knowingly executes, or attempts to execute, a scheme or artifice--
 
 
 64
 (1) to defraud a financial institution; or
 
 
 65
 (2) to obtain any of the moneys, [or] funds ... under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
 
 
 66
 shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
 
 
 67
 18 U.S.C.A. Sec. 1344 (West Supp.1993).
 
 
 68
 Defendant argues that she was impermissibly convicted for committing acts in furtherance of a scheme to defraud, when the bank fraud statute criminalizes only the execution of a scheme to defraud. In this way, the bank fraud statute differs from the mail fraud and wire fraud statutes, 18 U.S.C. Secs. 1341 and 1343, which expressly punish separate acts in furtherance of a scheme to defraud. See United States v. Lilly, 983 F.2d 300, 304 (1st Cir.1992); United States v. Lemons, 941 F.2d 309, 318 (5th Cir.1991). Defendant alleges that she is not challenging the indictment as multiplicitous, but rather, she is challenging the jury instructions. Defendant argues that the jury instructions, which authorized the jury to convict defendant for several offenses, constructively amended the indictment which alleged only one offense. However, the jury instructions as a whole are consistent with the indictment. And, as the government argues, defendant's argument can only be construed as a claim that the indictment is multiplicitous.
 
 
 69
 Defendant did not raise any objections to the indictment below and has waived her right to challenge the indictment itself. She may, however, attack the sentences imposed pursuant to the allegedly multiplicitous indictment. United States v. Rosenbarger, 536 F.2d 715, 721-22 (6th Cir.1976), cert. denied, 431 U.S. 965 (1977). That defendant received concurrent sentences of imprisonment does not change matters. In Ray v. United States, 481 U.S. 736, 737 (1987), the Supreme Court held that where a separate assessment fee is imposed on each count of conviction in addition to concurrent prison terms, the sentences are not in fact concurrent. Here, the District Court imposed a $50 assessment fee on each of the four counts of conviction.
 
 
 70
 What the government and defendant disagree about is what constitutes an execution of the scheme to defraud FTB. The government asserts that each time defendant delayed the entry of or failed to enter a currency-in-transit credit she executed the scheme. Defendant asserts that each delayed or failed entry was simply an act in furtherance of the scheme and that the scheme was not executed until each act in furtherance of the scheme was completed.
 
 
 71
 The indictment described defendant's scheme and artifice to defraud First Tennessee Bank as follows:
 
 
 72
 1. It was part of the scheme that AUDREY ANDERS would provide money, from the monies entrusted to her, to Jean Kay, a First Tennessee bank teller, to cover and conceal the theft and embezzlement of First Tennessee Bank monies.
 
 
 73
 2. It was part of the scheme that AUDREY ANDERS would not properly record transfers of First Tennessee money provided by her to Jean Kay.
 
 
 74
 3. It was a part of the scheme that AUDREY ANDERS would receive and "hold" incomplete personal checks from Jean Kay representing a shortage of First Tennessee Bank monies taken and embezzled.
 
 
 75
 4. It was a part of the scheme that AUDREY ANDERS would make late credit entries for cash shipments she had received in an effort to conceal the taking and embezzlement of bank monies.
 
 
 76
 5. It was a part of the scheme that AUDREY ANDERS would misapply a check intended to be credited to the First Tennessee Draft Clearance Account.
 
 
 77
 Joint App. at 57.
 
 
 78
 Defendant's counts of conviction as recited in the indictment read as follows:
 
 COUNT THIRTEEN
 
 79
 The Grand Jury realleges all of the allegations contained in Count One above except those contained in paragraph six.
 
 
 80
 On or about October 31, 1989, in the Western District of Tennessee, the defendant, AUDREY ANDERS, for the purpose of executing the aforesaid scheme and artifice to defraud First Tennessee Bank, Memphis, Tennessee and attempting to do so did receive a cash shipment of money in the amount of $45,000.00 and delayed processing of that cash shipment until on or about November 9, 1989, by using a Mid South Motors check drawn on First Tennessee Bank; in violation of Title 18, United States code, Sections 1344 and 2.
 
 COUNT FOURTEEN
 
 81
 The Grand Jury realleges all of the allegations contained in Count One above except those contained in paragraph six.
 
 
 82
 On or about November 7, 1989, in the Western District of Tennessee, the defendant, AUDREY ANDERS, for the purpose of executing the aforesaid scheme and artifice to defraud First Tennessee Bank, Memphis, Tennessee and attempting to do so did receive a cash shipment of money in the amount of $45,000.00 and did not process the currency in transit credit related to said cash shipment; in violation of Title 18, United States code, Sections 1344 and 2.
 
 COUNT FIFTEEN
 
 83
 The Grand Jury realleges all of the allegations contained in Count One above except those contained in paragraph six.
 
 
 84
 On or about November 14, 1989, in the Western District of Tennessee, the defendant, AUDREY ANDERS, for the purpose of executing the aforesaid scheme and artifice to defraud First Tennessee Bank, Memphis, Tennessee and attempting to do so did receive a cash shipment of money in the amount of $100,000.00 and did not process the currency in transit credit related to said cash shipment; in violation of Title 18, United States code, Sections 1344 and 2.
 
 COUNT SIXTEEN
 
 85
 On or about November 9, 1989, in the Western District of Tennessee, AUDREY ANDERS, being an employee and connected with First Tennessee Bank, with intent to injure and to defraud First Tennessee Bank, an institution insured by the Federal Deposit Corporation, did knowingly and wilfully misapply and cause to be misapplied the sum of approximately $38,000.00 of the funds and credits belonging and entrusted to the care and custody of First Tennessee Bank, in that the defendant caused a Mid South Motors Inc., check number 038663 payable to First Tennessee Bank in the amount of $38,000.00 to be used to process a currency in transit credit # 143060 in the amount of $45,000.00, making it appear that the said currency in transit credit represented only cash; in violation of Title 18, United States Code 656.
 
 
 86
 Joint App. 64-66.
 
 
 87
 Several circuits have addressed the issue of an allegedly multiplicitous indictment that charges violations of the bank fraud statute. In United States v. Poliak, 823 F.2d 371 (9th Cir.1987), cert. denied, 485 U.S. 1029 (1988), the defendant set up a check kiting operation, which involved three checking accounts at three separate banks in the names of three fictitious business. Poliak was charged with and convicted of ten counts of bank fraud for each check written during the scheme. The court held that each time Poliak wrote a check, a different and separate execution of the scheme to defraud the banks occurred. Id. at 372.
 
 
 88
 In Lilly, the defendant was charged with thirty counts of bank fraud for conduct that was determined to amount to only two offenses. The defendant sought a purchase-money loan from First Mutual Bank for Savings ("First Mutual") to finance the purchase of a condominium development project. In his efforts to secure the loan, Lilly pre-sold condominium units on a no-money-down basis. In all purchase-and-sale agreements, loan applications and closing documents, Lilly overstated the unit's purchase price and falsely reported that each buyer had made a ten percent downpayment. Lilly gave the purchasers first mortgages for the "balance" of the purchase price. Lilly then assigned twenty-nine mortgages and sets of false documents to First Mutual as security for a $7,000,000 loan.
 
 
 89
 The fraud on First Mutual was the basis for twenty-nine counts of the indictment; one count for each of the twenty-nine assigned mortgages. The court found that these twenty-nine counts all related to the single scheme of obtaining financing from First Mutual and involved only one crime. The court did not believe a jury could reasonably find that the actions described in the twenty-nine counts were separate executions of the First Mutual scheme.
 
 
 90
 In other words, appellant assigned to a single bank a single package of documents that consistently misstated a single material fact in order to obtain a single loan, the proceeds of which funded a single real estate purchase. We believe these facts are more comfortably categorized as a single execution of a scheme rather than as twenty-some-odd separate executions of a scheme.
 
 
 91
 Id. at 303. See also Lemons, 941 F.2d at 318 (5th Cir.1991) ("The movement of the benefit [of one fraudulent transaction] to Lemons, although in several separate stages or acts, was only part of but one performance, one completion, one execution of that scheme.").
 
 
 92
 We believe that the scheme in the present case bears more similarities to the check kiting scheme in Poliak than to the scheme to obtain a purchase-money loan in Lilly. As the court in Lilly observed when it was distinguishing Lilly's scheme from a check kiting scheme: "In check kiting schemes, more than one financial institution is ordinarily involved. More importantly, each check signifies a separate transaction requiring a separate issuance of money or credit on the part of the victimized bank." Lilly, 983 F.2d at 304. Another court has observed that "the common thread among the cases is that a scheme or artifice is 'executed' by the movement of money, funds or other assets from the institution." United States v. Mancuso, 799 F.Supp. 567, 571 (E.D.N.C.1992) (quoted in Lilly, 983 F.2d at 305).
 
 
 93
 We hold that each count of conviction represents a separate execution of defendant Anders' scheme to defraud FTB, for each act defrauded the bank by concealing the thefts of defendant and her co-conspirator. By delaying the entry of the October 31, 1989 $45,000 cash shipment (Count XIII), defendant was able to delay the discovery that she and/or Kay had taken cash from the bank; by failing to enter the November 7, 1989 $45,000 cash shipment (Count XIV) and the November 14, 1989 $100,000 cash shipment (Count XV), defendant was able to conceal her and her co-conspirator's theft and embezzlement from FTB; similarly, by misapplying the $38,000 Mid South Motors check (Count XVI), defendant defrauded FTB by covering up a prior delayed credit entry.
 
 IV. Restitution
 
 94
 At sentencing, the court found the entire loss to the bank of $283,000 was attributable to defendant as relevant conduct. The court believed that while defendant did not receive all of the $283,000, her joint activities with Kay caused the entire loss. The court also found that two incomplete checks in the amounts of $59,049 and $89,000 written by defendant indicated that she took at least those amounts. The court stated that a restitution order in excess of $200,000 would be futile. The court ultimately ordered restitution in the amount of $36,000.
 
 
 95
 The amount of restitution, in my mind, the range of the numbers is probably something like twenty-four thousand to three hundred and eighty-three thousand, and I think I think the minimum, in my mind, would be the twenty-four thousand type number and the max would be the total amount of the loss, even if I took the government's position and said it was $89,000, it is a substantial amount, and from a practical point of view, trying to balance the situation, knowing that this particular defendant has a considerable amount of ability and has demonstrated that in the past, I think that restitution in the amount of $36,000 is an appropriate amount. It may be that at a certain point in time there has to be a petition to reduce that amount, but based on the defendant's past ability to generate an income and all the factors that are present in this case, I think at this point I should impose that much restitution....
 
 
 96
 Joint App. at 154-55.
 
 
 97
 The imposition of restitution is governed by 18 U.S.C. Secs. 3663 and 3664, known as the Victim Witness Protection Act ("VWPA"). Under the 1988 version of the VWPA, "[t]he court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or ... in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense." 18 U.S.C. Sec. 3663(a)(1) (1988).
 
 
 98
 Defendant argues that the court impermissibly considered losses to the bank resulting from counts other than the counts of conviction. It is true that under the 1988 version of the VPWA a court may award restitution only for losses caused by the specific conduct that is the basis of the offense(s) of conviction. See United States v. Jewett, 978 F.2d 248, 251-52 (6th Cir.1992). While the VWPA was amended in 1990 to enlarge the definition of "victim" to include one who has been harmed by a "scheme ... or pattern of criminal activity", this Court has determined that this provision will not be applied retroactively to schemes executed prior to November 29, 1990. Id. at 252-53. What defendant ignores, however, is the fact that the $36,000 figure is well within the $183,000 amount of loss that resulted due to conduct alleged in the counts of conviction.
 
 V.
 
 99
 Accordingly, we AFFIRM the judgment of the District Court.
 
 
 
 [1]
 This section provides that when "a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant." 18 U.S.C. Sec. 3162(a)(2)
 
 
 [2]
 On March 31, 1992, this case (CR-91-20304-MI) was transferred from Judge Jerome Turner to Judge Jon Phipps McCalla. Case No. CR-90-20278-G was handled by Judge Julia Gibbons
 
 
 [3]
 In its order granting the continuance, the court mistakenly stated that the excludable time period ran from November 7, 1991 to the new trial date. The parties agree, as did the court, that the period began on December 16, 1991 and not on November 7th
 
 
 [4]
 A payroll teller maintains the excess cash to operate the branch. Regular tellers go to payroll tellers to buy money if they need amounts beyond their daily limit to cash checks, they also go to payroll tellers to sell their excess money if their receipts exceed their daily limit